[Cite as *State v. Ziga*, 2020-Ohio-911.]

# COURT OF APPEALS OF OHIO

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

STATE OF OHIO,                          :

    Plaintiff-Appellee,          :

                    No. 108336

    v.                                      :

GARY J. ZIGA,                          :

    Defendant-Appellant.        :

---

## JOURNAL ENTRY AND OPINION

**JUDGMENT:** AFFIRMED
**RELEASED AND JOURNALIZED:** March 12, 2020

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-17-622904-A

---

### *Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Jeffrey S. Schnatter and Allison M. Cupach, Assistant Prosecuting Attorneys, *for appellee.*

John A. Fatica, *for appellant.*

FRANK D. CELEBREZZE, JR., J.:

{¶ 1} Defendant-appellant, Gary Ziga ("appellant"), brings the instant appeal challenging his convictions for rape, gross sexual imposition, and kidnapping. Appellant argues that he was denied his constitutional right to the effective assistance of counsel, his convictions were not supported by sufficient evidence, and

his convictions are against the manifest weight of the evidence. After a thorough review of the record and law, this court affirms.

## I. Factual and Procedural History

{¶ 2} In the spring or summer of 2014, appellant was tasked with caring for the victim in this case, T.D., while the victim's mother, Me.D. (hereinafter "mother") was out of town for approximately three weeks. Appellant and the victim are cousins. At the time, the victim was ten years old.

{¶ 3} The victim alleged that appellant sexually assaulted her several times during this three-week period. She did not, however, disclose the abuse to anyone until she told her best friend and cousin, E.J., at a family reunion in 2017. After disclosing the abuse to E.J., the victim told her grandmother, Ma.D. (hereinafter "grandmother"). Grandmother told mother about the victim's allegations, and mother immediately took the victim to the police to report the sexual abuse.

{¶ 4} Based on the victim's allegations, the Cuyahoga County Grand Jury returned a 12-count indictment on November 30, 2017, charging appellant with: (1) rape (cunnilingus), in violation of R.C. 2907.02(A)(1)(b); (2) rape (fellatio), in violation of R.C. 2907.02(A)(1)(b); (3) rape (anal intercourse), in violation of R.C. 2907.02(A)(1)(b); (4) kidnapping, in violation of R.C. 2905.01(A)(4); (5) gross sexual imposition (forcing the victim to touch her own vagina), in violation of R.C. 2907.05(A)(4); (6) gross sexual imposition (forcing the victim to touch his penis), in violation of R.C. 2907.05(A)(4); (7) kidnapping, in violation of R.C. 2905.01(A)(4); (8) gross sexual imposition (touching the victim's vagina), in

violation of R.C. 2907.05(A)(4); (9) rape (vaginal intercourse), in violation of R.C. 2907.02(A)(1)(b); (10) rape (fellatio), in violation of R.C. 2907.02(A)(1)(b); (11) rape (cunnilingus), in violation of R.C. 2907.02(A)(1)(b); and (12) kidnapping, in violation of R.C. 2905.01(A)(4). Counts 4, 7, and 12 contained sexual motivation specifications.

{¶ 5} Counts 1-4 of the indictment pertained to offenses committed between June 7 and 8, 2014, at an apartment in Brooklyn. Counts 5-12 pertained to offenses committed between April 27 and June 6, 2014, at the victim's house in Bay Village. Counts 5-8 specifically pertained to offenses appellant committed on an evening they played a game of truth or dare. Appellant pled not guilty during his December 5, 2017 arraignment.

{¶ 6} A jury trial commenced on January 9, 2019. The victim testified in detail about the sexual abuse. The victim opined that appellant abused her "[o]ver a dozen times." (Tr. 214.) She explained, however, that she could not recall every single detail about every incident. Appellant abused her over the course of three weeks while mother was out of town. (Tr. 222.)

{¶ 7} The victim testified at trial about four specific incidents. The first incident occurred after the first couple of days appellant was watching her. She was in the living room one evening and appellant wanted to play truth or dare. The victim testified that the game "started off normal until he asked me to touch myself, and I refused. And so he had taken my hand and put it there and made me touch myself." (Tr. 210.) Appellant dared her to touch her "private parts." The victim did

not want to comply. Appellant asked her again, and when she declined, "[appellant] took [her] hand and rubbed it on [her] private part." (Tr. 211.) She confirmed that her private part was in reference to her vagina. During the same game, appellant dared the victim to "grab his penis through his shorts[.]" (Tr. 213.) When the victim did not want to comply, appellant grabbed her hand and made her touch him through his shorts. After appellant forced her to touch his penis, she went to her room.

{¶ 8} During the truth or dare game, the victim did not feel like she was able to remove herself from the situation: "I just felt like [appellant] had like a lot of authority over me and that if I were to leave, that I would get in trouble or, you know, get hurt, or where am I supposed to go? I didn't really have anywhere else to go." (Tr. 214.)

{¶ 9} A second incident occurred on the same evening as the truth or dare game. The victim testified that appellant got into bed with her: "I woke up, and [appellant] was in bed with me and he was rubbing my vagina with his hand." (Tr. 214.)

{¶ 10} A third incident occurred in appellant's bedroom. The victim testified that appellant "had me perform oral sex on him." (Tr. 217.) She explained, "[a]ll I remember is that I had to perform oral sex on him, and then he had performed oral sex on me." (Tr. 217.)

{¶ 11} Aside from the touching and oral sex, the victim testified that appellant would sometimes "take his penis and rub it on my vagina." (Tr. 119.) This occurred

"[a] lot of times." She explained that appellant would "rub his penis up and down her vagina." The victim asserted that appellant did not "fully" insert his penis into her vagina. However, she explained that appellant was "poking" her vagina with his penis and that appellant "poked" the tip of his penis "between the lips of her vagina." (Tr. 220-221.)

{¶ 12} The victim testified that appellant attempted to insert his penis into her anus. (Tr. 221.) This incident happened in the bedroom appellant was sleeping in at the Bay Village house. She was in a lot of pain, and appellant stopped when she began to scream.

{¶ 13} The fourth specific incident the victim testified about was the last time appellant assaulted her. Appellant brought the victim with him to a birthday party at his friend's apartment in Brooklyn. At some point during the evening, the victim became very tired so she laid down in a bedroom. The next morning, she woke up and appellant was in bed with her. The victim testified, "[appellant] smelled like beer. He had to be drunk. He tried to do anal again." (Tr. 228.) She explained that appellant "attempted to try anal again," and "the same exact thing happened, and I screamed and he stopped because it hurt really bad[.]" (Tr. 230.) His penis touched her vagina, appellant rubbed his penis on her vagina. The victim confirmed that appellant rubbed his penis against her vagina but "never fully insert[ed] it[.]" (Tr. 230.) Appellant made her perform oral sex on him, and he performed oral sex on her. She explained that there were others in the apartment at the time, but they were sleeping. (Tr. 231.)

**{¶ 14}** The morning after the birthday party, they left the apartment and began walking. The victim testified that appellant was "trying to use me for money." (Tr. 232.) She explained, "[appellant] was asking people if they could give him money for a bus back to Bay Village saying I needed to get back to Bay Village, but really we were just going to walk back to his house and see if one of his roommates could take us back to my house." (Tr. 232.) Appellant asked a man on a motorcycle if he could take the victim back to Bay Village. The motorcyclist called the police. Police responded to the Giant Eagle on West 117th Street in Cleveland.

**{¶ 15}** After speaking with appellant and the victim at the Giant Eagle, officers determined that appellant had an outstanding warrant for petty theft shoplifting. Officers placed appellant under arrest and had the victim's grandmother pick her up at the supermarket.

**{¶ 16}** As noted above, the victim did not disclose the sexual abuse until 2017. The victim testified that she did not tell anyone about the abuse because appellant threatened her, on multiple occasions, that he would hurt her family — specifically her grandmother — if she told anyone. When she disclosed the sexual abuse in 2017, the victim and her mother went to the Bay Village Police Department where they spoke with Detective Kevin Krolkosky.

**{¶ 17}** Detective Krolkosky interviewed the victim in August 2017. At the time, the victim was 14 years old. Detective Krolkosky conducted an investigation into her allegations. Following this investigation, officers determined that there was probable cause to arrest appellant. Appellant was arrested in November 2017.

{¶ 18} At the close of the state's case, defense counsel moved for a Crim.R. 29 judgment of acquittal. The trial court denied defense counsel's motion.

{¶ 19} The defense called three witnesses at trial: appellant's boyfriend, appellant's mother, and appellant. Appellant unequivocally and categorically denied the victim's allegations. The defense rested and renewed the Crim.R. 29 motion. The trial court denied the renewed motion.

{¶ 20} The jury returned its verdict on January 10, 2019. The jury found appellant guilty of rape as charged in Counts 1, 2, 3, 9, 10, and 11. The jury found appellant guilty of kidnapping as charged in Counts 7 and 12 of the indictment. The jury found appellant guilty of gross sexual imposition as charged in Counts 5, 6, and 8. The jury found appellant not guilty of kidnapping, in violation of R.C. 2905.01(A)(4) with a sexual motivation specification as charged in Count 4. The trial court ordered a presentence investigation report and referred appellant to the court psychiatric clinic for an evaluation pursuant to R.C. 2947.06(B).

{¶ 21} The trial court held a sentencing hearing on February 20, 2019. The trial court determined that Counts 5, 6, and 7 merged; and Counts 11 and 12 merged. The state elected to sentence appellant on Counts 7 and 12.

{¶ 22} The trial court imposed an aggregate prison term of life without parole for 35 years: life in prison with parole eligibility after 10 years for the rape offenses on Counts 1, 2, 3, 9, and 10; life in prison with parole eligibility after 15 years for the kidnapping offenses on Counts 7 and 12; and three years for the gross sexual imposition offense on Count 8.

{¶ 23} The trial court ordered Counts 1, 2, and 3 to run concurrently with one another; the trial court ordered Counts 9 and 10 to run concurrently with one another; and the trial court ordered the aggregate sentence on Counts 1, 2, and 3 to run consecutively to the aggregate sentence on Counts 9 and 10. The trial court ordered Counts 7 and 12 to run concurrently with one another but consecutively to the aggregate sentence on Counts 1, 2, and 3, and consecutively to the aggregate sentence on Counts 9 and 10. The trial court ordered Count 8 to run concurrently with all other counts. The trial court classified appellant as a Tier III sex offender, child offender registrant, and reviewed appellant's reporting requirements.

{¶ 24} On March 22, 2019, appellant filed the instant appeal challenging his convictions. He assigns three errors for review:

I. [Appellant] received ineffective assistance of counsel when counsel failed to request a psychiatric evaluation of [appellant] prior to trial.

II. [Appellant's] rape convictions are not supported by legally sufficient evidence as required by state and federal due process.

III. The jury's verdicts finding [appellant] guilty are not supported by the manifest weight of the evidence and his convictions violate his rights to a fair trial and due process as protected by the Constitutions of the United States and of the state of Ohio.

## II. Law and Analysis

### A. Ineffective Assistance of Counsel

{¶ 25} In his first assignment of error, appellant argues that he was denied his constitutional right to the effective assistance of counsel.

{¶ 26} In order to prevail on a claim of ineffective assistance of counsel, a defendant must demonstrate: (1) deficient performance by counsel, i.e.,

performance falling below an objective standard of reasonable representation, and (2) counsel's errors prejudiced the defendant, i.e., a reasonable probability that but for counsel's errors, the result of the proceeding would have been different. *Strickland v. Washington*, 466 U.S. 668, 687-688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *State v. Bradley*, 42 Ohio St.3d 136, 538 N.E.2d 373 (1989), paragraphs two and three of the syllabus.

{¶ 27} In this case, regarding the first *Strickland* prong, appellant argues that counsel's failure to raise the issue of appellant's competency to stand trial or request a psychiatric evaluation of appellant before trial constituted deficient performance. Appellant acknowledges that the trial court referred him to the court psychiatric clinic for a post-verdict evaluation, pursuant to R.C. 2947.06, for purposes of determining an appropriate sentence, and that trial counsel concurred with this referral. However, appellant contends that the post-verdict evaluation "served of little value" given the nature of his convictions. Appellant's brief at 3.

{¶ 28} In support of his argument that trial counsel should have raised the issue of appellant's competency and requested an evaluation before trial, appellant contends that the record contains sufficient evidence about his psychiatric issues. Specifically, appellant directs this court to the following evidence in the record: (1) victim's testimony at trial about appellant trying to strangle himself with a belt and asking for victim's assistance in doing so; (2) appellant attempting suicide in the back of the police car at Giant Eagle using a shoe lace; (3) appellant's testimony about previous suicide attempts, including driving a bicycle in front of a vehicle,

trying to hang himself in front of his boyfriend, and trying to overdose on heroin;[1] and (4) appellant's testimony that he has bipolar disorder and attention deficit disorder and that he is "not on the proper medications at this time."  (Tr. 494.) Finally, appellant asserts that although counsel characterized him as "weird" and "strange," counsel did not raise the issue of appellant's competency or request an evaluation.

{¶ 29} As an initial matter, we note that most, if not all of the evidence based upon which appellant contends that counsel should have requested a competency evaluation before trial was adduced *during* trial.  Appellant cannot rely on this trial testimony as evidence based upon which counsel should have requested a competency evaluation *before* trial.

{¶ 30} Nevertheless, we find no basis upon which to conclude that counsel's failure to request a competency evaluation constitutes deficient performance.  The record before this court does not contain sufficient indicia of incompetence. Appellant does not argue, much less demonstrate, nor does the record reflect that appellant did not understand the nature of the trial court's proceedings or that he was unable to assist in his defense.

{¶ 31} As noted above, appellant testified at trial that he suffers from bipolar disorder and attention deficit disorder.  Appellant also testified that he attempted suicide on several occasions.  With respect to the suicide attempt in the back of the

---

[1] *See* tr. 489-490.

police car during the Giant Eagle incident, however, appellant testified that he "wasn't really trying to kill [himself]" and that he "was trying to draw attention to [himself], trying to get out of petty theft because [he] knew the procedure." (Tr. 491.) Appellant's testimony is indicative of a deliberate, calculated attempt to manipulate the criminal justice system.

{¶ 32} Regarding appellant's diagnoses and other suicide attempts, these mental illnesses do not indicate that appellant was not competent to stand trial. "Incompetency must not be equated with mere mental or emotional instability or even with outright insanity. A defendant may be emotionally disturbed or even psychotic and still be capable of understanding the charges against him [or her] and of assisting his [or her] counsel." *State v. Bock*, 28 Ohio St.3d 108, 110, 502 N.E.2d 1016 (1986); *see State v. Ketterer*, 111 Ohio St.3d 70, 2006-Ohio-5283, 855 N.E.2d 48, ¶ 71 ("The fact that a defendant is taking * * * prescribed psychotropic drugs does not negate his competence to stand trial."). This court has held that a person suffering from mental illness or taking psychotropic drugs may be able to understand the charges against him or her and assist in his or her defense. *See State v. McClendon*, 8th Dist. Cuyahoga No. 103202, 2016-Ohio-2630, ¶ 16, citing *State v. Robinson*, 8th Dist. Cuyahoga No. 89136, 2007-Ohio-6831.

{¶ 33} The record reflects that appellant understood and actively participated in the proceedings below, and assisted in his defense. Appellant participated in plea negotiations, rationally explained why he chose to defend against the charges at trial rather than entering a plea agreement, inquired about his

speedy trial rights, filed a pro se motion to dismiss the case based on speedy trial grounds, and authored notes that he used during his trial testimony.

{¶ 34} Appellant acknowledges that he has a criminal history dating back to when he was 18 years old. At the time of trial, appellant was 49 years old. There is no evidence in the record that in any of his prior criminal cases, appellant had been found incompetent or insane, or that any of his cases were transferred to the mental health docket.

{¶ 35} For all of these reasons, appellant's ineffective assistance claim fails under the first *Strickland* prong. We find no basis upon which to conclude that the failure of appellant's trial counsel to request a competency evaluation constituted deficient performance.

{¶ 36} Assuming arguendo that counsel's failure to request a competency evaluation before trial constituted deficient performance, appellant's ineffective assistance claim fails under the second *Strickland* prong because he has failed to demonstrate a reasonable probability that had counsel requested a competency evaluation, the outcome at trial would have been different. While appellant argues that counsel should have requested a pretrial evaluation, he does not argue, much less demonstrate, how he was prejudiced by counsel's purported deficiency. We decline to construct an argument on appellant's behalf. To the extent that appellant is suggesting that had counsel requested an evaluation some exculpatory or mitigating information would have been uncovered, this argument is purely speculative and insufficient to satisfy his burden of demonstrating prejudice.

{¶ 37} Appellant's first assignment of error is overruled.

## B. Sufficiency

{¶ 38} In his second assignment of error, appellant argues that his rape convictions on Counts 3 (anal) and 9 (vaginal) were not supported by sufficient evidence because the state failed to establish the requisite element of penetration.

{¶ 39} The test for sufficiency requires a determination of whether the prosecution met its burden of production at trial. *State v. Bowden*, 8th Dist. Cuyahoga No. 92266, 2009-Ohio-3598, ¶ 12. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus.

{¶ 40} Appellant was charged in Counts 3 and 9 with rape, in violation of R.C. 2907.02(A)(1)(b), which provides, "[n]o person shall engage in sexual conduct with another who is not the spouse of the offender * * * when [t]he other person is less than thirteen years of age, whether or not the offender knows the age of the other person."

{¶ 41} Sexual conduct is defined in R.C. 2907.01(A) as

> vaginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse.

**{¶ 42}** In support of his sufficiency challenge, appellant argues that the victim's testimony "fails to establish the element of penetration." Appellant's brief at 5.

### 1. Count 3

**{¶ 43}** Count 3 alleged that appellant committed the offense of anal rape at the Brooklyn apartment after the birthday party. The victim's testimony pertaining to Count 3 refers to and builds upon her testimony about a prior incident at her house in Bay Village during which appellant attempted to insert his penis into her anus.

**{¶ 44}** Regarding the prior incident, the victim testified that "[o]ne time [appellant] attempted to do anal, and it had hurt so bad that I screamed and he stopped." (Tr. 221.) The following exchange took place between the prosecutor and the victim:

> [Prosecutor]: You said [appellant] attempted to do anal. So he was using his penis? And was the pain caused by him actually trying to put it into your anus? Did it go in at all, is that what you were feeling, the pain?
>
> [Victim]: I believe so.

(Tr. 221.)

**{¶ 45}** Regarding the rape offense charged in Count 3, the victim asserted that she became very tired during the party so she laid down in a bedroom. The next morning, she woke up and appellant was in bed with her. The victim testified, "[appellant] smelled like beer. He had to be drunk. He tried to do anal again." (Tr. 228.) Referencing the prior incident at the Bay Village house, the victim

explained, that appellant "attempted to try anal again." (Tr. 229.) The following exchange took place between the prosecutor and the victim:

[Prosecutor]: When you say try, describe what [appellant] did and what you felt.

[Victim]: Well, *the exact same thing happened*, and I screamed and he stopped because it hurt really bad[.]"

(Emphasis added.) (Tr. 230.)

{¶ 46} After reviewing the record, we find that the evidence presented by the state, if believed, was sufficient to establish the element of penetration on Count 3. The victim believed that appellant's penis went into her anus during the first incident at the Bay Village house. Regarding the second incident at the Brooklyn apartment, the victim testified that "the exact same thing happened." The jury could have reasonably determined that appellant's penis did, in fact, penetrate the victim's anus during the first incident, and because "the exact same thing happened" at the Brooklyn apartment, the jury could have reasonably determined that appellant's penis did, in fact, penetrate the victim's anus for purposes of Count 3.

{¶ 47} The state also presented circumstantial evidence from which the jury could have reasonably inferred that appellant's penis did, in fact, penetrate the victim's anus. It is well-established that circumstantial evidence has the same probative value as direct evidence. *Jenks*, 61 Ohio St.3d at 272, 574 N.E.2d 492.

{¶ 48} As noted above, the victim testified that when appellant attempted to insert his penis into her anus, "it hurt really bad," causing her to scream. (Tr. 230.) The jury could have reasonably inferred that the extreme pain described by the

victim was caused by slight or partial penetration, rather than mere contact. *See State v. J.M.*, 10th Dist. Franklin No. 14AP-621, 2015-Ohio-5574, ¶ 14 (based upon ten-year-old victim's testimony that defendant "put his finger 'a little bit in' when rubbing near her genitals and that it 'hurt[] inside,'" a rational factfinder could conclude that defendant's finger did, in fact, enter the victim's vagina.).

{¶ 49} For all of these reasons, appellant's rape conviction on Count 3 was supported by sufficient evidence. Appellant's second assignment of error is overruled in this respect.

### 2. Count 9

{¶ 50} Count 9 alleged that appellant committed the offense of vaginal rape at the Bay Village house in the bedroom appellant was sleeping in while he was babysitting her. The victim testified that aside from the touching and oral sex, appellant would sometimes "take his penis and rub it on my vagina." (Tr. 119.) This occurred "[a] lot of times." She explained that appellant would "rub his penis up and down her vagina."

{¶ 51} When the state asked the victim if any part of appellant's penis went inside her, she asserted that she did not know. The following exchange took place between the prosecutor and the victim.

[Prosecutor]: Well, did you feel anything?

[Victim]: Yes.

[Prosecutor]: What were you feeling?

[Victim]: Well, I knew — well, what I'm saying right now, he wasn't having sex with me.

[Prosecutor]:  Okay.  When you say sex, what do you mean by sex?

[Victim]:  Penis like inside.

[Prosecutor]:  Like fully inside?

[Victim]:  Yes.

[Prosecutor]:  What were you feeling?

[Victim]:  Just like, kind of like poking me.

[Prosecutor]:  Poking you like with the tip of [his penis], between your [vaginal] lips?

[Victim]:  Yes.

(Tr. 220-221.)

{¶ 52} As an initial matter, a ten-year-old cannot reasonably be expected to understand or recall what constitutes penetration — particularly under the traumatic circumstances present in this case.  Nevertheless, the victim's testimony pertaining to Count 9 only confirms that appellant did not fully insert his penis into her vagina.  The victim's testimony that appellant "wasn't having sex with me" and that his penis was not "fully inside" is not dispositive of the issue of partial penetration.

{¶ 53} After reviewing the record, we find that the evidence presented by the state, if believed, was sufficient to establish the element of penetration on Count 9.  The victim testified that appellant was "poking" her vagina with his penis.  Appellant's act of "poking" the victim's vagina with his penis is distinct from and goes beyond his act, as described by the victim, of "rubbing" his penis on her vagina.

The victim confirmed that appellant "poked" the tip of his penis "*between* [her vaginal] lips[.]" (Emphasis added.) (Tr. 220-221.)

{¶ 54} Based on the victim's testimony, the jury could have reasonably determined that appellant slightly or partially penetrated the victim's vagina when he was poking his penis in between the lips of her vagina. Accordingly, appellant's rape conviction on Count 9 was supported by sufficient evidence. Appellant's second assignment of error is overruled in this respect.

### C. Manifest Weight

{¶ 55} In his third assignment of error, appellant argues that his convictions are against the manifest weight of the evidence.

{¶ 56} In contrast to sufficiency of the evidence, "weight of the evidence involves the inclination of the greater amount of credible evidence." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). While "sufficiency of the evidence is a test of adequacy as to whether the evidence is legally sufficient to support a verdict as a matter of law, * * * weight of the evidence addresses the evidence's effect of inducing belief." *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, ¶ 25, citing *Thompkins* at 386-387. "In other words, a reviewing court asks whose evidence is more persuasive — the state's or the defendant's?" *Id.* The reviewing court must consider all the evidence in the record, the reasonable inferences, and the credibility of the witnesses to determine "'whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed

and a new trial ordered.'" *Thompkins* at 387, quoting *State v. Martin*, 20 Ohio App.3d 172, 485 N.E.2d 717 (1st Dist.1983).

{¶ 57} In support of his manifest weight challenge, appellant appears to argue that the victim and her trial testimony was not credible because (1) the victim waited three years to report the allegations against appellant, whereas she reported an incident involving her mother to her school on the same day; (2) the victim's allegations are not corroborated by other evidence; (3) the hickeys the victim described were not noticed by others; and (4) although the victim testified that she screamed when appellant attempted to insert his penis into her anus in the Brooklyn apartment, the people in the room next door did not hear any screaming.

{¶ 58} First, regarding the delay in the victim's disclosure of the sexual abuse, the victim explained why she did not report appellant's conduct to anyone: "I knew the entire time that this is not okay, but [appellant] had told me that if I were ever to say anything about what we were doing, that my family would be like hurt, specifically my grandma." (Tr. 218.) Appellant threatened the victim not to tell anyone on more than one occasion. (Tr. 218.) Appellant told the victim, "don't tell anybody or else, like your family will be sorry." (Tr. 222.) The victim believed that appellant was 100 percent serious about his threats. She believed appellant was serious because he drank a lot, and he was "really scary" when he would get mad. (Tr. 223.) On one occasion, appellant got mad when he wrote the victim a note and she did not write him a note back. As a result, appellant started throwing and breaking things.

{¶ 59} The victim testified about why she finally came forward to report the sexual abuse after the family reunion in 2017 where she ran into appellant. She explained, "it just made me sick seeing him around kids. It made me sick seeing him." (Tr. 237.) She continued, "[appellant] being near a child made me want to throw up. And I couldn't handle it anymore, and a few days later I went and I told my cousin [E.J.] everything." (Tr. 237.) She confirmed that she told E.J. that appellant sexually abused her and that she had not told anyone else about the abuse. The victim felt that E.J. needed to know about the abuse because "there's kids in our family now. There's little kids. And I know I'm not the only one he's done this to. I know I'm not the only one." (Tr. 238.)

{¶ 60} After telling E.J., she told her grandmother a few days later. She waited a few days to tell her because she knew it would break her grandmother's heart. The victim's grandmother told the victim's mother about the sexual abuse. The mother immediately took the victim to the police where they spoke with Detective Krolkosky.

{¶ 61} The jury also heard testimony about an incident that occurred between the victim and her mother in the fall of 2013 that the victim reported to her teacher at school immediately, on the same day. The victim told her teacher that her mother hit her while she was getting ready for school in the morning. The mother explained that the incident involved her "hit[ting the victim] in the morning trying to hustle her along to get her out the door to the bus on time." (Tr. 271.) The teacher reported the allegation to the police, and an investigation was conducted. Detective

Krolkosky investigated the allegation, and determined that the "physical discipline" was not criminal in nature. A referral was made for the victim and mother to participate in counseling. The victim explained that she reported the incident involving her mother to her teacher the same day because unlike appellant, her mother had not threatened her. (Tr. 223.)

{¶ 62} Caroline Adams, a clinician at the University of Kentucky's Center on Trauma and Children, started treating the victim in February 2018. Adams had been working with the victim for approximately nine months at the time of trial.

{¶ 63} Adams testified that her clients typically have a delay in disclosing sexual abuse. (Tr. 316.) Adams explained the reasons for delayed disclosure:

> So, typically it has to do with worries, fear of any kind of negative consequences due to disclosure. It's very common for a child not to disclose not only sexual abuse but any other type of abuse, but as far as sexual abuse goes, some reasons are fear of being harmed, fear of loved ones being harmed. I know this is true in [the victim's] case in particular. She reported her perpetrator [appellant] had threatened to harm her and her loved ones if she disclosed what occurred. So causing emotional distress to loved ones.
>
> In [the victim's] case, her grandparents who had health issues and I know she was worried about causing distress to her grandparents and them getting sick and not being able to handle this kind of information. Being seen differently by others so having someone look at you differently as if you are damaged goods because you've been violated in this way, especially when it comes to sexual abuse, this can be real big and cause self-blame and shame like there's something wrong with me. There has to be some reason why this happened to me. So all of these reasons, and not being believed. Especially when you have an interpersonal relationship with the perpetrator, it can be very hard to want to disclose and tell other people they all see positively hurt me in some way. There's lots of different reasons why a person may not tell initially.

(Tr. 316-317.) Adams testified that it is much more common for victims of abuse to have a delayed disclosure rather than an immediate disclosure, which is "much more rare." (Tr. 318.)

{¶ 64} On cross-examination, Adams opined that it was not "particularly unusual for a child to wait three years to disclose what occurred, especially when it comes to sexual abuse. That has so much stigma attached to it that some people never disclose sexual abuse to wait several years before they disclose it. So, I wouldn't consider [the victim's 40-month delay in disclosure] [ab]normal." (Tr. 325-326.)

{¶ 65} Detective Krolkosky testified that based on his experience in juvenile rape investigations, the victim's delay in disclosure was "[n]othing unusual at all" and "not uncommon[.]" (Tr. 417.)

{¶ 66} Based on the victim's testimony that appellant threatened to harm her and her family if she disclosed the sexual abuse to anyone, the jury could have reasonably concluded that the victim did not come forward for three years because she was afraid that appellant would carry out these threats.

{¶ 67} Second, appellant's argument regarding the purported lack of corroborating evidence is misplaced. "A victim's testimony alone is sufficient to support a conviction for sexual conduct." *State v. Murphy,* 8th Dist. Cuyahoga No. 107836, 2019-Ohio-4347, ¶ 25, citing *State v. Bacho*, 8th Dist. Cuyahoga No. 93828, 2010-Ohio-4885. Although corroboration is not required, the record reflects that the victim's testimony is supported by other evidence presented by the state at trial.

{¶ 68} The victim testified how appellant's conduct affected her life: "I can't think. I have flashbacks all the time. Certain things trigger me. Like [appellant] used to say 'good deal' a lot. Whenever somebody says 'good deal', I feel sick or hear the number 44, that is how old he was, I was sick. And even like the name Gary." (Tr. 240.) The victim has been seeing a therapist to deal with these feelings.

{¶ 69} The victim's mother testified about the effect that appellant's conduct had on the victim's life: "I feel like I'm living with a soldier who has PTSD. It's horrible. It's really, it's hard." (Tr. 280.) Mother explained that the victim has "[e]xtreme anxiety, mood swings, insomnia, inability to focus. [Appellant's conduct has] affected her school." (Tr. 280-281.)

{¶ 70} The victim's counselor, Adams, testified that the victim "met criteria across the board for PTSD" and that the victim has not wanted to talk about the sexual abuse because it is so distressing to her. (Tr. 312-313.) Adams diagnosed the victim with PTSD. On cross-examination, Adams confirmed that her clinical impression is that the victim is "experiencing difficulties associated with PTSD." (Tr. 332.)

{¶ 71} Third, regarding the hickeys, the victim confirmed on cross-examination that she had numerous hickeys on her neck following the birthday party at the apartment in Brooklyn. She explained, however, that she put makeup on her neck and that she did not show the hickeys to anyone else. (Tr. 249-250.)

{¶ 72} Fourth, regarding the incident at the Brooklyn apartment, the victim testified that there were others in the apartment at the time appellant assaulted her,

but they were sleeping. (Tr. 231.) Three witnesses that attended the birthday party testified at trial.

{¶ 73} Sharon Elias lives at the Brooklyn apartment, and it was her birthday that was being celebrated. Elias testified that everybody was drunk, so much so that she prevented people from driving home because they drank too much. (Tr. 395.) They were all doing crack in the bedroom, while the victim was in the living room. She did not hear any screaming that night, and the other guests, Michael Djukic and Stanley Tolbert, did not indicate to her they heard screaming. However, on redirect examination, she testified that she probably would not have heard any sounds coming from the bedroom because she "drank quite a bit." (Tr. 401.) Stanley Tolbert, Elias's boyfriend, who lives at the Brooklyn apartment with her, testified that he did not hear any screams while he was sleeping in the living room. He had been drinking and doing crack. Although Tolbert testified that Michael Djukic slept at the apartment on the couch in the living room after the birthday party, Djukic testified that he left the birthday party around 11:00 p.m. He confirmed that he did not know what happened after he left. The jury could have reasonably concluded that these witnesses did not hear the victim's scream because they were sleeping, passed out from excessive alcohol and drug use, or, in Djukic's case, because he was no longer at the apartment.

{¶ 74} As noted above, the victim testified in detail about appellant's sexual abuse. On the other hand, appellant categorically denied the victim's allegations and trial testimony. Appellant's convictions are not against the manifest weight of the

evidence merely because the jury rejected the defense's theory that appellant did not sexually abuse the victim and found the victim's testimony to be more believable than appellant's testimony. "'[A] conviction is not against the manifest weight of the evidence simply because the jury rejected the defendant's version of the facts and believed the testimony presented by the state.'" *State v. Jallah*, 8th Dist. Cuyahoga No. 101773, 2015-Ohio-1950, ¶ 71, quoting *State v. Hall*, 4th Dist. Ross No. 13CA3391, 2014-Ohio-2959, ¶ 28. The jury did not lose its way in resolving the conflicting theories based on the evidence presented at trial.

{¶ 75} For all of the foregoing reasons, we find no basis upon which to conclude that appellant's convictions for rape, gross sexual imposition, and kidnapping are against the manifest weight of the evidence. The jury heard testimony from multiple witnesses, including the victim, regarding the delay in disclosure.

{¶ 76} This is not an exceptional case in which the evidence weighs heavily against appellant's convictions or that the jury clearly lost its way in finding appellant guilty of rape, gross sexual imposition, and kidnapping. Accordingly, appellant's third assignment of error is overruled.

### III. Conclusion

{¶ 77} After thoroughly reviewing the record, we affirm appellant's convictions. Appellant was not denied his constitutional right to the effective assistance of counsel. Appellant's convictions for rape, gross sexual imposition, and

kidnapping were supported by sufficient evidence and are not against the manifest weight of the evidence.

{¶ 78} Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's convictions having been affirmed, any bail pending is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
FRANK D. CELEBREZZE, JR., JUDGE

SEAN C. GALLAGHER, P.J., and
RAYMOND C. HEADEN, J., CONCUR